UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

REGINALD S. PUIFORY,                    :
                                        :
    Plaintiff,                          :
                                        :
v.                                      :   3:08-CV-982
                                        :   (JUDGE VANASKIE)
EDWARD F. REILLY, Jr. et al.,           :
                                        :
    Defendants.                         :

<u>MEMORANDUM</u>

I.    INTRODUCTION

On June 5, 2007, Plaintiff Reginald S. Puifory, an inmate confined at the United States Penitentiary at Lewisburg, Pennsylvania, brought this civil rights action under 42 U.S.C. § 1983 in the United States District Court for the District of Columbia. Named as Defendants in the 78-paragraph complaint were the Chairman and four Commissioners of the United States Parole Commission ("Commission") in their official capacities.[1] Plaintiff, proceeding *pro se*, challenges the Commission's denial of parole on the ground that Defendants wrongly applied the Commission's 2000 guidelines at his parole hearings rather than the guidelines of the defunct District of Columbia Board of Parole ("Board") that were in effect when he committed the murder for which he is presently incarcerated.

---

[1] The five Defendants are Commission Chairman Edward F. Reilly, Jr., and Commissioners Cranson J. Mitchell, Deborah A. Spagnoli, Patricia K. Cushwa, and Isaac Fulwood, Jr.

Specifically, Plaintiff contends that the retroactive application of the 2000 guidelines results in a significant risk of prolonging his sentence beyond that which "would have resulted under the guidelines in effect when [he] was convicted." (Compl., Dkt. Entry 1, ¶ 69.)[2] Count I of Plaintiff's Complaint asserts that Defendants' application of the 2000 guidelines violated the Ex Post Facto Clause of Article I of the United States Constitution. Count II contends that failure to accord Plaintiff credit for satisfactory completion of institutional programs after Plaintiff's first parole hearing violated his due process rights. (Id., ¶¶ 69, 78.)

The Hon. Royce C. Lamberth, now Chief Judge of the District of Columbia District Court, granted Defendants' motion to dismiss the action to the extent that it contested venue, and transferred the action to this Court by Order dated April 17, 2008.[3] (Dkt. Entry

---

[2] For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted. No endorsement of any provider of electronic resources is intended by the Court's practice of using hyperlinks.

[3] Plaintiff has moved to re-transfer this case to the District Court for the District of Columbia (Dkt. Entry 27), essentially challenging Chief Judge Lamberth's finding that venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(2) and (3). As Judge Lamberth accurately stated in his transfer order, (Dkt. Entry 23), "the events giving rise to this action occurred in Lewisburg, Pennsylvania, which is also where plaintiff currently resides and where any further parole proceedings will likely occur." Judge Lamberth noted that although Plaintiff's initial hearing in 2000 occurred at the District of Columbia's Central Facility, Defendants did not then apply the guidelines at issue. Furthermore, although the record does not indicate the location of Plaintiff's rehearings in 2002 and 2004, the most recent denial of parole in August 2007 occurred in Lewisburg. Finally,
(continued...)

23.) At the time of the transfer of this action, there was pending Defendants' motion to dismiss for failure to state a claim upon which relief may be granted, or alternatively, for summary judgment. (Dkt. Entry 7 & Dkt. Entry 8.) The motion has been fully briefed. Because the holding of Brown v. Williamson, No. 06-3703, 2009 WL 205626 (3d Cir. Jan. 29, 2009) (non-precedential), recognizing the viability of an ex post facto claim under facts materially indistinguishable from those presented here, is persuasive, albeit not controlling, Defendants' motion will be denied.[4]

II.     BACKGROUND

On March 10, 1978, Plaintiff was sentenced to his current term of twenty-five (25) years to life for felony murder while armed and burglary while armed. (Compl., Dkt. Entry 1, ¶ 12.) Plaintiff's current sentence arose from a homicide that occurred on August 29,

---

[3](...continued)
contrary to Plaintiff's contention, even if venue in this case is governed by 28 U.S.C. § 1391(b), and not by § 1391(e) (which applies specifically to suits against federal officers in their official capacities), venue still does not lie in the District of Columbia because Plaintiff has not shown that any Defendant resides in the District of Columbia, and a substantial part of the events giving rise to this action occurred within this District so that the fact that a particular Defendant may be subject to the personal jurisdiction of the District of Columbia Court is irrelevant because this action could have been brought here. Accordingly, Plaintiff's motion to re-transfer venue will be denied.

[4]Defendants did not address the viability of the due process claim concerning credit for program achievements presented in Count II of Plaintiff's Complaint. Although it is doubtful that Plaintiff had a protected interest in receiving a reduction in his prison time for program achievements, see Ellis v. District of Columbia, 84 F.3d 1413, 1420 (D.C. 1996), Defendants' failure to address the issue obviates consideration of Count II at this time.

1977. On that day, Plaintiff engaged in an argument with the victim that became physical. After leaving the scene of the argument to retrieve a shotgun from his home, Plaintiff returned and shot the victim. (Def.'s Mtn. Dismiss, Ex. 2, Commission's Notice of Action ("NOA") dated Aug. 9. 2007, Dkt. Entry 7-3, at 15.)

Notably, the homicide for which Plaintiff is currently incarcerated occurred within nine months of Plaintiff's release on parole arising from an earlier homicide on April 6, 1975. In the 1975 homicide, Plaintiff stabbed the victim because he made threatening moves towards Plaintiff and his cousin, who had been involved in a relationship with the victim. Plaintiff was sentenced to three years for manslaughter. (Defs.' Mtn. Dismiss, Ex. 1, Commission's NOA dated Dec. 26, 2000, Dkt. Entry 7-2, at 6.)

At the time of Plaintiff's second homicide conviction, jurisdiction over parole decisions for D.C. Code violators was vested in the Board. In 1998, however, jurisdiction over parole decisions for D.C. offenders was transferred from the Board to the Commission through the National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745 (effective August 5, 1998); D.C. Code § 24-131 (2001). The Revitalization Act required the Commission to follow D.C. parole law and regulations, but it also gave the Commission "exclusive authority to amend or supplement any regulation interpreting or implementing" D.C. parole laws. See D.C. Code § 24-131 (formerly § 24-1231).

At the time that Plaintiff committed the murder for which he is now imprisoned, the Board's consideration of parole was governed by six factors. As explained by our Court of Appeals in Brown:

> The first two criteria related to the underlying offense and the offender's prior criminal history. §§ 105.19(a), (b). Another criterion related to the offender's "institutional experience." § 105.1(e). The other criteria related to: the "[p]ersonal and social history of the offender, including such factors as his family situation, educational development, socialization, marital history, employment history, use of leisure time and prior military experience, if any," § 105.1(c); the offender's "physical and emotional health and/or problems which may have played a role in [his] socialization process, and efforts made to overcome any such problems," § 105.1(d); and the "[c]ommunity resources available to assist the offender with regard to his needs and problems," § 105.1(f).

2009 WL 205626, at *5.

In 1987, the Board published point-based guidelines to channel its exercise of discretion in deciding whether to award parole. Under the 1987 guidelines, each prisoner was assigned a Total Point Score ("TPS") that was used as a guide to determine whether an inmate should be paroled or held in prison for a rehearing. The TPS, however, did not result in a recommendation of the total time to be served before an offender should be paroled; it only resulted in a determination as to when the offender should be paroled or have another parole hearing. The TPS was calculated by adding or subtracting points for pre- and post-incarceration factors, including whether the prisoner's current conviction "involved violence against a person." Ellis v. District of Columbia, 84 F.3d 1413, 1416

(D.C. Cir. 1996). The Board, however, retained discretion to grant or deny parole notwithstanding the result recommended by the TPS. Id. at 1419 (explaining that "under the regulations, a prisoner with a low total point score shall be granted parole unless the Board, in the exercise of its discretion, believes there is some other reason for not granting him parole").

Effective August 5, 1998, the Commission adopted an expanded version of the TPS calculation pursuant to its "amend and supplement" authority. See 28 C.F.R. § 2.80 (1999). This revised scoring system calculated a Salient Factor Score ("SFS") for purposes of determining the risk of recidivism. The SFS was then used in formulating the inmate's Base Point Score ("BPS"), which took into consideration not only the risk of recidivism as indicated by the SFS, but also such matters as current or prior violence and death of the victim, i.e., accountability for the crime itself. See Reynolds v. Williamson, No. 3:04-CV-2396, 2005 WL 3050154, at *1 (M.D. Pa. Nov. 14, 2005) (Nealon, J.). Finally, the BPS was adjusted according to an inmate's institutional record to arrive at the TPS.[5] Ultimately, the TPS was the numerical guideline by which parole was suggested or discouraged, though the action recommended by the TPS remained subject to the Commission's discretion. If parole was denied, the Commission used the BPS to

---

[5] Points were subtracted from an inmate's BPS for program achievement while incarcerated, or added for incidents requiring disciplinary action. The number produced by these additions and subtractions from the BPS was the TPS.

formulate specific rehearing guideline ranges that replaced the Board's rehearing guideline.

Plaintiff had his initial parole hearing in November of 2000, at which time he had been imprisoned approximately 272 months on his sentence. (Defs.' Mtn. Dismiss, Ex. 1, "D.C. Initial Prehearing Assessment," Dkt. Entry 7-2.) At Plaintiff's initial parole hearing on November 9, 2000, the Commission applied its 1998 guidelines for D.C. Code offenders. Parole was denied because his TPS of six (6) fell within the numerical guidelines for denial and the Commission found that a departure from the guidelines was not warranted. (Defs.' Mtn. Dismiss, Ex. 1, NOA dated Dec. 26, 2000, Dkt. Entry 7-2, at 2.) The rehearing guidelines indicated that a rehearing should be scheduled for 18 to 24 months later. (See Id.)

The Commission's parole guidelines underwent further revisions effective December 4, 2000. See 28 C.F.R. § 2.80 (2001), *originally published at* 65 Fed. Reg. 70663 (Nov. 27, 2000). As explained in the Summary of the Final Rule published in the Federal Register:

> The revised version of § 2.80 eliminates the Total Point Score from the Point Assignment Table (i.e., the system of adding or subtracting points for post-incarceration factors), and eliminates the system of determining at each hearing (based on the Total Point Score) whether the inmate qualifies for parole at that time. It substitutes the following decisionmaking procedure. Under Step 1, a Base Guideline Range is determined from the Base Point Score. There is no change from the Base Point Score used in § 2.80. The time expected for the inmate to qualify for parole (assuming no

7

disciplinary infractions and ordinary program achievement) is simply made explicit. Under Step 2, the Parole Eligibility Date is recorded. Under Step 3, a Disciplinary Guideline Range is determined (if there are any disciplinary infractions) based on the time ranges prescribed at § 2.36. Under Step 4, a Superior Program Achievement Award (if superior program achievement is found) is determined. The Superior Program Achievement Award is based on the number of months of superior program achievement on the inmate's prison record (i.e., program achievement that would have qualified for a two-point deduction under the current system that this rule will replace). Under Step 5, Base Point Guideline Range, Parole Eligibility Date, Disciplinary Range, and the Superior Program Achievement Award are combined, at the initial hearing, into a Total Guideline Range. This will make clear to the inmate the amount of time he or she may expect to serve with continued good conduct and ordinary program achievement. The impact of superior program achievement as well as disciplinary infractions will also be made clear. Equally importantly, if release within three years is deemed appropriate by the Commission, the inmate can be given a presumptive release date (contingent upon continued good behavior and the development of a satisfactory release plan). Otherwise, the inmate is continued for a rehearing, normally at 36 months, when the granting of a presumptive release date will again be considered. At each rehearing, the Total Guideline Range from the previous hearing is used as the starting point and is modified by adding the amount, if any, from Step 3 (based on conduct since the last hearing) and subtracting the amount, if any, from Step 4 (based on conduct since the last hearing). The result is the Total Guideline Range to be used at the rehearing.

65 Fed. Reg. 70663-64 (Nov. 27, 2000). The Commission further explained that "the Point Assignment Table remains the basis upon which the guidelines are determined." Id. at 70633.

Thus, under the 2000 guidelines, the Commissioner used a point-based system to determine a recommended range of confinement, as opposed to obtaining a recommendation of either parole or deny and schedule another hearing. The Commission

made the 2000 guidelines applicable to D.C. Code offenders who received their initial hearings before the Commission, i.e. those offenders, like Plaintiff, whose initial parole hearings occurred on or after August 5, 1998. 28 C.F.R. § 2.80(a) (2003).

At Plaintiff's September 9, 2002 rehearing, parole was again denied because Plaintiff fell within the numerical guidelines for denial.[6] The NOA from the 2007 rehearing states, "[t]he Commission conducted a rehearing on 9/9/02, and via notice of action dated 9/25/02, denied parole with a rehearing in 9/04 after the service of an additional 24 months. The subject had a total point score of 6." (Defs.' Mtn. Dismiss, Ex. 2, NOA dated Aug. 9, 2007, Dkt. Entry 7-3, at 19.)

As of the August 30, 2004 rehearing, Plaintiff had been incarcerated approximately 324 months. Although the NOA for the 2004 rehearing is not before the Court at this time, the NOA for the 2007 rehearing indicates that Plaintiff's imprisonment range under the TGR system was 324 months to 342 months. Thus, having served 324 months in prison, Plaintiff was eligible for parole at that time. For reasons that are not in the record before this Court, however, Plaintiff was continued for a rehearing in 24 months, which was later extended to 36 months.

By the time of Plaintiff's most recent rehearing on July 24, 2007, he had been incarcerated approximately 359 months. The imprisonment range under the TGR system

---

[6] The record does not include the Commission's NOA for its 2002 decision.

called for confinement of between 324 and 344 months. The Commission departed from the guidelines in denying Plaintiff parole and scheduling a rehearing for July 2010. In doing so, the Commission expressly found that "a decision above the Current Total Guideline Range is warranted because [Plaintiff is] a more serious risk than indicated by [his] guidelines because [he] had paroled from a previous sentence for Manslaughter only 9 months prior to committing the current murder offense. [Plaintiff's] involvement in two homicides makes [him] a more serious risk than indicated by [his] base point score . . . ." (Def.'s Mtn. Dismiss, Ex. 2, Dkt. Entry 7-3, at 2.)

III.     DISCUSSION

   A.  Standard of Review

A plaintiff's obligation to state a claim for relief under Rule 8(a)(2) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). Instead, the "[f]actual allegations must be enough to raise a right to relief above a speculative level." Id. Even under this more demanding standard for stating a viable cause of action, the appropriate inquiry on a motion to dismiss remains "only whether [plaintiff is] entitled to offer evidence to support [his] claims," Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000), and not whether a plaintiff will prevail or is likely to prevail on the merits. The claims asserted in the amended complaint will be assessed in the context of this

standard of review.

### B. Ex Post Facto Claim

A law contravenes the Ex Post Facto Clause if it "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts." Collins v. Youngblood, 497 U.S. 37, 43 (1990). "Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept." Garner v. Jones, 529 U.S. 244, 250 (2000). Specifically, retroactive application of a parole regulation may violate the ex post facto prohibition if it "creates a significant risk of prolonging [the prisoner's] incarceration." Id. at 250-51.

There are two prongs to the ex post facto inquiry: "(1) whether there was a change in the law or policy which has been given retrospective effect, and (2) whether the offender was disadvantaged by the change." Richardson v. Pa. Bd. of Prob. & Parole, 423 F.3d 282, 287-88 (3d Cir. 2005). Significantly, "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." Garner, 529 U.S. at 250. Instead, as explained in Richardson, 423 F.3d at 288, "a retroactive change in the law or policy must create a 'sufficient risk of increasing the measure of punishment attached to the covered crimes'; a 'speculative and attenuated possibility of . . . increasing the measure of punishment' is not enough." (quoting Calif. Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995)). Thus, "'when the rule does not by its

11

own terms show a significant risk [of increasing punishment, Plaintiff] must demonstrate, by evidence drawn from the rule's practical implementation . . ., that its retroactive application will result in a longer period of incarceration than under the earlier rule.'" Kyle v. Lindsay, Civ.A.No. 3:06-0948, 2007 WL 1450402, at *5 (M.D. Pa. May 15, 2007) (quoting Garner, 529 U.S. at 255).

Defendants argue that Plaintiff is unable to plead facts sufficient to suggest a "significant enough difference between the Parole Board and Commission's guidelines to meet the legal threshold [for an ex post facto violation]." (Defendants' Reply Brief, Dkt. Entry 17, at 4.)  In this regard, Defendants assert that the ample discretion afforded the Board to make parole decisions effectively precludes Plaintiff from showing that the Commission's decision under the 2000 guidelines had the effect of prolonging Plaintiff's incarceration beyond that which would have resulted under the Board's exercise of discretion.

It is indeed clear that in 1977 the Board had considerable discretion in determining whether to parole a D.C. offender, with discretion circumscribed only by a list of the broad criteria mentioned in Brown and quoted above.  See Sellmon v. Reilly, 551 F. Supp. 2d 66, 86 n.15 (D.D.C. 2008).   Moreover, "[w]hether retroactive application of a particular change in parole law respects the prohibition on ex post facto legislation is often a question of particular difficulty when the discretion vested in the parole board is taken into

12

account . . . ." Moore v. O'Brien, No. 7:06-CV-00515, 2007 WL 1412934, at *3 (W.D. Va. May 10, 2007). But the mere fact that parole decisions are discretionary is not, in and of itself, sufficient to immunize a retroactive change in parole guidelines from ex post facto review. See Garner, 529 U.S. at 250.

In Brown, our Court of Appeals addressed the viability of an ex post facto claim under circumstances very similar to those presented here. Brown, like Plaintiff, was convicted in the District of Columbia in 1978 for killing a man. Brown was sentenced to a prison term of 30 years to life. Also like Plaintiff, Brown had an exemplary prison record. At his initial parole hearing in 2006, the Commission applied the 2000 guidelines, codified at 28 C.F.R. § 2.80, rather than the guidelines that were in effect at the time of the offense. Contending that application of the 2000 Commission guidelines posed a substantial risk of prolonging his incarceration, Brown sought habeas corpus relief.[7] Specifically, Brown asserted that implementation of a point-based scoring system with specific guideline ranges, as opposed to the rather open-ended system that existed prior to the Board's adoption of its 1987 guidelines, violated the Ex Post Facto Clause. Brown

---

[7] In this matter, relief has been sought, not under the habeas corpus statute, but under 42 U.S.C. § 1983. Defendants have not challenged the justiciability of Plaintiff's claims by way of a civil rights action. In this regard, it should be noted that the Supreme Court has concluded that actions that "seek relief that will render invalid the state procedures used to deny parole eligibility . . . and parole suitability . . ." may be brought under § 1983 because success on such a claim "would [not] necessarily spell speedier release." Wilkinson v. Dotson, 544 U.S. 74, 82 (2005).

also argued that the Commission's current guidelines were more detrimental to him because of the weight given various factors, such as the nature of the criminal conduct and the harm that resulted.  Finally, Brown argued that the Commission's guidelines presented a substantive shift in focus that made it likely that his confinement would be extended beyond the period that the original guidelines would have produced.

Our Court of Appeals, although disagreeing with Brown's first contention,[8] held that his second two arguments were sufficiently meritorious as to preclude adjudication of the ex post facto claim without an opportunity to engage in discovery and present facts at an evidentiary hearing.  Specifically, the appeals court found that the six points assessed for the violent death of Brown's victim added a number of years to his guideline range beyond that which may have resulted under the Board's point-based system.  In other words, the "offense accountability period," i.e., the time to be served to account for the seriousness of the crime, may be longer under the Commission's approach.  Brown, 2009 WL 205626, at *5. Contrasting the Commission's decision under the 2000 guidelines with the result that would have been obtained under the 1987 scoring system used by the Board, the Third Circuit found it significant that "Brown would have been presumptively suitable for parole"

---

[8] Thus, the mere fact that new point-based guidelines were used here does not establish an ex post facto violation, and numerous cases have so held.  See Jennings v. Hogstein, Civil No. 3:CV-06-0679, 2008 WL 191483, at *4 (M.D. Pa. Jan. 22, 2008) (citing cases).

at an earlier point in time than under the Commission's guidelines.[9]  Id.  The Third Circuit thus concluded in Brown that "the discrepancy between the guidelines constitutes more than conjecture that 'the practical effect of the [new guidelines] was to change the weight that [this particular factor] was given in the parole calculation.'"  Id.

The Third Circuit also found problematic the fact that the Commission's current guidelines failed to make provision for certain of the criteria that the Board was required to consider under the law in effect at the time of Brown's offense.  The court observed that "[w]hereas the prior guidelines emphasized the internal and external problems that might have driven an offender to commit a crime and his efforts to overcome them, the current guidelines focus almost exclusively on the severity of the underlying crime and the offender's criminal history."  Id. at *6.  The court then concluded:

> Although a parole agency or state "may learn from experience" and adjust

---

[9] Plaintiff in this matter has sought to argue that the Commission's use of its 2000 guidelines must be contrasted with the result that would pertain under the 1987 Board guidelines.  Contrary to Plaintiff's assertion, however, the focus here is not on regulations that went into effect after Plaintiff's conviction that may have been applied had he been eligible for parole earlier.  Instead, "a court entertaining an ex post facto claim must focus upon the law in effect at the time of the offense for which a person is being punished." Forman v. McCall, 709 F.2d 852, 856 (3d Cir. 1986).  Thus, the appropriate comparison here is between the parole regime in effect in 1977 and the one applied by the Commission.  Nonetheless, because the scoring system adopted by the Board in 1987 "implemented no significant substantive changes to the 1978 guidelines," Brown, 2009 WL 205262, at *5, it may be appropriate to consider the result that may have pertained under the 1987 scoring system for purposes of determining whether application of the 2000 Commission guidelines cause a significant risk of prolonged incarceration.  Id.

15

its parole criteria accordingly, that "does not mean that those who were sentenced at an earlier juncture may now be more severely re-sentenced in the light of newly-found wisdom. This is precisely what the Ex Post Facto Clause prohibits." The discrepancy between the emphasis placed on an offender's mental, physical, and social characteristics by the prior guidelines and the lack of consideration given to those factors by the current guidelines indicates a substantive shift that might subject Brown to a more severe sentence.

Id. The court thus vacated the dismissal of the habeas petition and remanded the matter because Brown was "entitled to 'a searching comparison of the old and new parole regimes in order to determine whether the Parole Commission's application of the federal . . . regulations . . . created a significant risk that he will be subjected to a lengthier incarceration than he would have been if the Commission had adhered to the rules and practices of the D.C. Board.'" Id. (quoting Fletcher, 433 F.3d at 879).

Brown, as a non-precedential opinion, is not binding. Nonetheless, the analysis of the unanimous panel is compelling. As in Brown, Plaintiff in this case is confronting a parole regime that is much different than that which prevailed at the time he committed his offense. Defendants argue that it is the fact that Puifory has committed two homicides that explains the decision to deny parole, asserting that it was unlikely that Plaintiff would have been released earlier by the Board.[10] Brown, however, militates against an

---

[10] Defendants acknowledge that Plaintiff would have been eligible for parole under the Board's 1987 guidelines at the time of his initial hearing in 2000. (Defendant's Reply Brief, Dkt. Entry 17, at 6-7.) Defendants assert, however, that it is likely that the Board
(continued...)

16

approach that precludes an ex post facto claim because the decisionmaker has substantial discretion under the old and new parole systems. Stated otherwise, it cannot be concluded as a matter of law at this juncture that Plaintiff would be unable to establish that retroactive application of the Commission's 2000 regulation poses a significant risk of prolonging his confinement.

## IV. CONCLUSION

For the reasons set forth above, Defendants' dispositive motion will be denied.[11] An appropriate Order follows.

s/ Thomas I. Vanaskie<br>
Thomas I. Vanaskie<br>
United States District Judge

---

[10](...continued)
would have exercised its discretion to deny parole in light of the facts of this case. (Id. at 7.) Defendants contend that the Board routinely denied parole for violent offenders like Plaintiff. Other than referring to summary information reported in the Federal Register, however, Defendants have not presented any admissible evidence on this point. See Sellmon, 551 F. Supp. 2d at 90.

[11] Defendants moved alternatively for summary judgment. The record, however, is incomplete for summary adjudication of Plaintiff's claim. In this regard, the only exhibits submitted by Defendants concerned the 2000 and 2007 actions taken by the Commission. Moreover, Plaintiff should be accorded an opportunity to engage in discovery for purposes of carrying his burden of establishing an ex post facto violation.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REGINALD S. PUIFORY, | : |
| Plaintiff, | : |
| v. | : 3:08-CV-982 |
| | : (JUDGE VANASKIE) |
| EDWARD F. REILLY, Jr. et al., | : |
| Defendants. | : |

## ORDER

NOW, THIS 30th DAY OF MARCH, 2009, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Dismiss, or in the alternative, for summary judgment (Dkt. Entries 7 and 8) is DENIED.

2. Plaintiff's Motion to Transfer Venue (Dkt. Entry 27) is DENIED.

3. A telephone scheduling conference shall be held Friday, April 10, 2009 at 11:00 a.m. Counsel for Defendants shall be responsible for arranging the call to (570) 207-5720 and all counsel shall be ready to proceed before the undersigned is contacted.

                                              s/ Thomas I. Vanaskie
                                              Thomas I. Vanaskie
                                              United States District Judge